FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2015 AUG 27  AM 8: 58

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ANTHONY COHEN                              *

Plaintiff                                       *

v                                               *        Civil Action No. WMN-14-1850

WEXFORD HEALTH SOURCES, INC., at al. *

Defendants                                   *
                                        ***

### MEMORANDUM

Defendants William Beeman, Kristi Cortez, Dr. Colin Ottey, James Hunt, Katie Winner and Wexford Health Source Inc. (hereinafter "Medical Defendants") filed a Motion for Summary Judgment. ECF  82.  Defendants Warden Frank Bishop, Correctional Dietary Officer Anthony Durst, Sergeant Jeremy Crites, Correctional Officer II Matthew Eagleson, Lieutenant George McAlpine, Major Thomas Mellott, Correctional Officer II Daniel Mortimer, and Correctional Officer II Dean Rounds, Jr. (hereinafter "Correctional Defendants") filed a Motion to Dismiss or in the Alternative for Summary Judgment.[1]  ECF  85.   Plaintiff opposes both motions (ECF 97 and 98), which were later supplemented (ECF 103 and 104)[2] and moves for default judgment (ECF 99).  Also pending are Plaintiff's Motions for Preliminary Injunction (ECF 52 and 105) and for Appointment of Counsel (ECF  77).

The Court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2014).   For the reasons set forth below summary judgment shall be denied in part, counsel shall

---

[1]   The Clerk shall be directed to correct the docket with the proper spelling of all Defendants' names as reflected herein.

[2]   Although it is clear the supplemental responses were prepared by an attorney, neither contain the attorney's name, address, telephone number, and bar number as required by Local Rule 102.1.a.ii (D. Md. 2014).

be appointed to represent Plaintiff, the motion for default judgment shall be denied, and the further progression of this case shall be governed by the schedule in the Order that follows.

## Background

The Complaint concerns Plaintiff Anthony Cohen's ("Cohen") claim that he was assaulted by correctional staff on March 7, 2014, and suffered injuries to his face and head. Cohen alleges Sergeant Gordon and Officers J. Crites and Eagleson, together with two other unnamed officers, attacked him as he was cleaning up his cell. ECF 1 at pp. 3- 4. Cohen states that the named officers beat his head, face, and neck while the unknown officers held his arms behind his back. Specifically, he claims Gordon was punching him in the face while Eagleson punched him in the head and neck. *Id.* at p. 4. He further claims that Crites choked him to the point of unconsciousness during the assault. *Id.*

He states when he regained consciousness he was on the floor of the cell and one of the officers kicked him in the face and head, knocking his head into the steel toilet. *Id.* Cohen claims he was dazed by the assault, but recalls being taken to the property storage area where he was placed into a cage and his hands were uncuffed. Cohen alleges he was told to strip, but he was too dazed to comply with the order and was having trouble moving his arms and fingers. *Id.* Because he was not complying with orders, Cohen claims Gordon became angered and told him that he "was not playing." *Id.* Cohen states he could not respond to Gordon, so Gordon choked him into unconsciousness. When he regained consciousness, Cohen states he was being held up by Gordon and Crites. Gordon ordered Crites to remove Cohen's socks, leaving Cohen in only his underwear. *Id.* He was then taken to the medical department.

Cohen states he was examined by Registered Nurse James Hunt, who told Lt. McAlpine there was nothing he could do for Cohen. He claims Hunt asked him if he could breathe and

2

Cohen was unable to respond to the question. Two days later, on March 9, 2014, Cohen was seen by Kelly Fincham, LPN, and informed her that he could not stand up without becoming dizzy, losing balance, and falling down. Cohen also complained of severe headaches, losing focus in his right eye, and numbness and pain in his right arm and fingers. ECF 1 at p. 5.

On March 12, 2014, Cohen was seen by Kristi Cortez, RN, who determined Cohen had a fever, high blood pressure, and a mild concussion. Cohen claims he was not seen again until eleven days later when he was examined by Dr. Ottey. Cohen told Ottey about the symptoms he reported to Cortez and alleges that, in response to his complaints, Ottey "stated a lot of things but nothing was done." As a result, Cohen claims he continued to file sick call slips. ECF 1 at p. 5.

On April 2, 2014, Cohen was seen by PA Winner and again explained his symptoms, adding that the right side of his face was numb and felt rubbery. Cohen claims that, again, a lot was said, but nothing was done. He also states that at every encounter with medical staff he requested x-rays of his head, right arm, and fingers. ECF 1 at p. 6.

On May 13, 2014, Cohen states he was seen by Janette Clark, NP, who told him correctional staff informed medical staff that Cohen had refused medical treatment and x-rays on multiple occasions. Cohen told Clark that he had never refused any medical treatment and stated it was his belief prison staff was attempting to cover up "the assault and battery crime" that had been committed against him. Clark allegedly informed Cohen that if the officers again reported that he refused an x-ray, she would send a member of the medical staff to confirm his refusal. The following day, Cohen received an x-ray. ECF 1 at p. 6.

Cohen was seen again by Clark on May 23, 2014, and the results of his x-ray were discussed. Cohen states his skull was fractured without displacement. He claims his question about the treatment required for the fracture went unanswered. Cohen states he has continued to

3

send in sick call slips, but has not yet received treatment for his injury because "the medical staff are in a conspiratorial relationship with this administration as to act as if nothing has happen[ed] or is wrong" with him. ECF 1 at p. 7.

Cohen asserts he should not have been allowed to leave the medical department in the condition he was in on the date of the alleged assault. He claims it should have been clear to "any medical personnel" who saw him that the trauma he suffered was not ordinary as he could not even sit-up without assistance. Despite his condition, Cohen states Hunt allowed security staff to place him in an isolation cell and made no effort to follow up on his condition later that day. ECF 1 at p. 7.

### Procedural Background

Cohen filed a Motion for Preliminary Injunction (ECF 18) seeking immediate medical attention for his fractured skull. The motion was opposed by Medical Defendants (ECF 26) and denied by this Court based on statements made that Cohen was being treated for hyperparathyroidism,[3] scheduled for a CT scan of his head as a follow-up to an x-ray showing a fracture to his skull, and being evaluated for surgery. ECF 55 at p. 3.

Medical Defendants filed a Motion to Dismiss the complaint for failure to state a claim upon which relief could be granted. ECF 33. That motion was denied by this Court based on Cohen's assertion that it took 11 months for Medical Defendants to acknowledge the injury he suffered as a result of the assault and to begin to address it. ECF 61 at p. 10. Because the Medical Defendants focused their entitlement to dismissal on the treatment Cohen was receiving

---

[3]  Hyperparathyroidism is a disorder in which the parathyroid glands, located in the neck and attached to the back side of the thyroid gland, produce too much parathyroid hormone. Parathyroid hormone controls calcium, phosphorous, and vitamin D levels in the blood and bone.
*See* http://www.nlm.nih.gov/medlineplus/ency/article/001215.htm.

for his hyperparathyroidism and did not address the delay in treating Cohen's injuries suffered from the assault, the Complaint survived scrutiny under Fed. R. Civ. Proc. 12(b)(6).  *Id.*

### Preliminary Injunctive Relief

Cohen filed two additional Motions for Preliminary Injunction which remain pending. ECF 52 and 105.  In the first motion he claims Correctional Defendants are withholding meals and denying him the opportunity to see medical staff.  ECF 52. Cohen claims that officers walk by his cell with the dinner cart and refuse to feed him.  He also states that officers will come to his cell, tell him he has a medical pass, tell him he refuses the pass, and walk away.  *Id.* at p. 2. He further claims that correctional officers are refusing to provide him with additional fluids which were ordered by medical staff for his "thyroid problem" and dehydration.  *Id.*  Cohen states when he complained about being denied additional fluids, Bishop responded that Cohen has water in his cell.  *Id.*  Cohen states he was sent to the infirmary at Western Correctional Institution (WCI) one week later to receive IV fluids due to this refusal to provide additional fluids.  *Id.*  Cohen seeks a transfer to another prison as well as an order mandating treatment for his "other serious medical problems."  *Id.* at pp. 3 – 4.

In his August 7, 2015 Motion for Preliminary Injunction, Cohen states that on July 29, 2015, he was taken to Western Maryland Health System in Cumberland, Maryland, where he was given a CT Scan.  ECF 105 at p. 2.  He claims that Dr. Surjit S. Julka at Bon Secours Hospital had a consultation  with Dr. Mahboob Ashraf of Wexford Health by telephone on June 25, 2015, and Cohen was present for the meeting.  *Id.*  Cohen asserts that Dr. Julka ordered an MRI, not a CT Scan, for his head injuries and ordered a test for his thyroid.  *Id.*  Dr. Ashraf explained to Cohen that a CT Scan and MRI are the same thing; that the CT Scan showed an old fracture of the zygomatic arch; and that he has no signs of a brain injury or current fracture.  *Id.*

at p. 3. Cohen claims he continues to experience right eye pain with loss of vision and severe headaches, but despite these symptoms Dr. Ashraf told Cohen nothing was wrong with him. *Id.* Cohen states he requested a copy of the CT Scan, but his request was denied. He, again, seeks a transfer to another facility or, in the alternative, an order requiring his treatment by an outside doctor. *Id.* at p. 4.

A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). To obtain a preliminary injunction, a movant must demonstrate: 1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4) that an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam).

Correctional Defendants deny interfering with delivery of medical care to Cohen or subverting medical directives. ECF 85-1 at pp. 9 – 10. They rely on statements made by Nurse Practitioner Clark who explains that the symptoms Cohen attributes to the March 7, 2014 incident can all be symptoms of hyperparathyroidism and/or post-concussion syndrome. She further states that:

> Plaintiff has refused to cooperate with the treatment that has been recommended for him on multiple occasions. On July 29, 2014, Plaintiff refused a medical trip for consultation with the endocrinologist regarding his hyperparathyroidism. Plaintiff's refusal to meet with the endocrinologist on July 29, 2014 has delayed his treatment for hyperparathyroidism, and limited the ability of the health care providers to treat plaintiff.

ECF 85-1 at p. 9, quoting ECF 82-5 at p. 2.

Cohen states he told Clark he never refused to go for an x-ray and she prepared a

document for his medical record indicating that if "patient declines xrays, medical needs to go to cell and have ROR signed." ECF 97 at Ex. 6.   It is not disputed that Cohen engaged in two hunger strikes in an effort to obtain additional medical care. *See* ECF 82-5 at p. 2.

On July 29, 2014, Cohen was told he was scheduled for a medical trip and refused to leave his cell.   When Defendant Beeman reported to Cohen's cell door and explained to Cohen the medical trip was for hyperparathyroidism surgery, Cohen responded with "fuck you." ECF 82-5 at p. 132.   Beeman reported that Cohen then began shaking his genitals at him and the correctional officer who accompanied him.  *Id.*   A release of responsibility (ROR) was prepared and signed by Beeman and  Correctional Officer Rounds.  *Id.* at p. 338.

Cohen filed correspondence with the Court providing his version of the events regarding the July 29, 2014 medical trip.  ECF 27.   He claims that Officers Murray and Rounds came to his cell at 8:00 a.m. on July 29, 2014, and told him to pack up his property because he was being moved to another cell.   Cohen states he responded, "no, I refuse to move" and claims he refused housing because he felt the move was retaliatory.  *Id.* at p. 1.   Cohen states that Murray then said that they were there to take Cohen to his medical trip and asked Cohen if he was going.   Cohen claims Rounds asked him if he was moving and Cohen again said "no."  *Id.*   Based on this exchange, Cohen states that Rounds told Murray that Cohen had refused his medical trip.   Cohen further claims that Beeman came to his cell with Rounds approximately one hour later and asked Cohen to sign a refusal form.   Cohen alleges he told Beeman and Rounds he did not refuse the medical trip and Beeman and Rounds walked away from the cell.  *Id.* at p. 2.

The medical record also reflects numerous incidents where Cohen allegedly declined medical care.   Although some of the ROR forms are not properly signed, most are signed by a medical care provider and a member of correctional staff. *See* ECF 82-5 at pp. 7, 20, 23, 34, 43,

133, 134, 161, 174, 194, 208, 216, 225, 230, 281, 284, 286, 296, 297, 309, 326 – 31, and 334 – 338. These refusals include declining medication, blood draws, nurse sick call appointments, and surgery. *Id.* Cohen's own narrative regarding the medical trip scheduled for July 29, 2014, indicates that he did in fact reply "no" when asked if he was going to go on the medical trip.[4] ECF 27. Whether that was his true intent or not is of no consequence as correctional and medical staff are not required to engage in a lengthy discussion to cajole an uncooperative inmate into complying with offered medical care in order to avoid liability.

Cohen also mischaracterizes the warden's response to his ARP. The response indicates that Cohen was in fact given additional fluids and that he had access to water in his cell. The response does not indicate a callous disregard for medical orders; rather, it refutes Cohen's claim that orders were being ignored. Additionally, Cohen's transfer to the WCI infirmary was required by his voluntary hunger strike, which complicated his condition and required treatment for dangerously high levels of calcium in his blood stream. The assertion that Cohen's condition worsened due to correctional officers' refusal to abide by medical orders is not supported by objective evidence.

Cohen's August 7, 2015 Motion for Preliminary Injunction is also not compelling. ECF 105. His assertion that "proper treatment" is not being provided is evidently based on his misunderstanding regarding the medical test ordered and whether it makes a difference that he was provided with a CT Scan as opposed to an MRI. In addition, it appears Cohen's insistence on receiving tests is for the purpose of establishing he suffered an injury as the result of the force used against him by correctional officers - - is affecting his care as opposed to determining what, if anything, is the root cause for his pain. In short, Cohen's disagreement with medical decisions

---

[4] Cohen does not directly deny Beeman's account of his use of foul language and obscene gestures during their encounter. ECF 27.

on how best to approach his diagnosis and treatment is not a viable basis for an award of

injunctive relief.  The Motions for Preliminary Injunction shall be denied.

### Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that
> there is no genuine dispute as to any material fact and the movant
> is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will

defeat the motion:

> By its very terms, this standard provides that the mere existence of
> *some* alleged factual dispute between the parties will not defeat an
> otherwise properly supported motion for summary judgment; the
> requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club,*

*Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw

all inferences in her favor without weighing the evidence or assessing the witness' credibility."

*Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  The court

must, however, also abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal

quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and

citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Analysis

### Excessive Force

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992). This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley v. Albers*, 475 U. S. 312, 321 (1986). The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkens v. Gaddy*, 599 U.S. 34 (2010). The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id.* at 34.

In their Motion to Dismiss or for Summary Judgment, Correctional Defendants provide a narrative of events leading to the use of force against Cohen in the serious incident report. ECF 85-4. At the time Cohen was assigned to disciplinary segregation and Defendant Jeremy Crites was assigned to the unit. Crites states in his report that he came to Cohen's cell at approximately 4:02 p.m. on March 7, 2014, and told Cohen that another inmate was moving into his cell. Crites claims that Cohen became agitated and responded, "Fuck you guys I am not taking a cell buddy." *Id.* at p. 15. Crites states in his report that Cohen refused his orders to come to the cell door to submit to handcuffing, and instead covered his cell window. *Id.* Crites claims he then heard Cohen banging on something inside the cell. As the loud banging continued, Crites ordered

10

Cohen to uncover his cell window. Cohen refused to comply and continued to beat on something inside the cell. Crites notified Sgt. Justin Gordon via radio of the situation. *Id.*

Sgt. Gordon arrived at Cohen's cell accompanied by Officers Anthony Durst and Matthew Eagleson. The accounts provided by these officers conflict as to the rationale for entering Cohen's cell, and Cohen relies in part on this discrepancy as a basis for denying summary judgment. ECF 98-1 at p.11. Crites states in his declaration under oath and in the Notice of Infraction later issued to Cohen (also written under oath), that orders for Cohen to uncover his window "so we could perform a wellness check"[5] were repeated by Gordon, but Cohen did not comply. ECF 85-5 at p. 3. Gordon's statement under oath provided for the Serious Incident Report does not mention a wellness check, nor does he state he ordered Cohen to the door to be cuffed. ECF 85-4 at pp. 11 – 12. Rather, Gordon states he ordered Cohen to uncover his window "and stop his actions," but when Cohen did not respond he ordered the door opened. *Id.* Eagleson also does not mention a wellness check in his declaration under oath provided for this case and states that Gordon ordered Cohen to uncover his window. ECF 85-8. Eagleson states when Cohen did not uncover his window and the banging continued, Gordon ordered the door opened. *Id.* Durst does not mention a wellness check in his declaration under oath and claims Gordon ordered Cohen to uncover his window and to come to the cell door for cuffing. ECF 85-7. Durst states that when Cohen refused to comply with Gordon's orders, Gordon called for the cell door to be opened. *Id.*

---

[5] Correctional Defendants have not provided any clarification for the discrepancy, nor did they provide the pertinent Division of Correction Directive describing the procedures or the circumstances requiring a "wellness check." On May 13, 2014, when Crites was interviewed for purposes of preparing a response to Cohen's administrative remedy complaint, he explained that the cell door was ordered open so they could see what Cohen was doing and to keep him from destroying state property. ECF 85-17 at p. 34. Crites further claimed that when the door was opened, Cohen "charged at the officers." *Id.*

All of the officers' accounts agree that Gordon called to have the cell door opened after the loud banging noise continued and Cohen did not comply with orders to uncover his window. ECF 85-4 at p. 10. As the door opened, all assert that Cohen was "in a fighting stance" and came at Crites, who was in the lead, swinging his arms with clenched fists. *Id.* at p. 16. Crites states he continued to order Cohen to submit to handcuffing upon entering the cell. *Id.* at p. 16. Cohen threw a punch at Crites as Crites wrapped his right arm around Cohen's head and clasped his hands together in an attempt to gain control of Cohen. *Id.* at p. 16. Durst moved to the back of the cell and attempted to grab Cohen's feet so he could take him to the floor. *Id.* at pp. 17 and 18. Eagleson reports he grabbed Cohen around the waist from behind by wrapping both arms around him. *Id.* at p. 13. Despite those efforts, Cohen continued to be noncompliant to orders and physically resisted efforts to gain control. *Id.* at pp. 13, 16, and 18.

Eagleson states he attempted to force Cohen to the floor, but was unable to do so as Cohen continued to swing his arms wildly to resist their efforts. *Id.* at p. 14. Durst secured Cohen's legs by crossing his right leg over the back of his left leg. *Id.* at p. 18. Durst applied pressure to Cohen's left ankle and Cohen was "rolled belly down." *Id.* at p. 18. Eagleson states that Gordon threw closed fist punches to Cohen's face to assist in regaining control. *Id.* at p. 14. Gordon states he gave multiple orders to stop resisting but Cohen continued his aggressive behavior. *Id.* at p. 12. Following Gordon's punches, they were able to force Cohen to the floor. *Id.* at pp. 12 and 14.

As Cohen was forced to the floor, Crites states he released his head and, once on the floor, Cohen bit Crites on his lower right leg. *Id.* at p. 16. Crites states he "pushed" Cohen's head away to stop the assault. *Id.* at p. 16. Gordon ordered Cohen to put both of his hands behind his back, but Cohen refused the orders and tucked his hands under his body, preventing

the officers from cuffing him. *Id.* Eagleson states he grabbed Cohen's left arm with both hands and was able to pull it out from underneath Cohen and place it behind his back. *Id.* at p. 14. Eagleson placed a handcuff on Cohen's left wrist and, after Gordon pulled Cohen's right arm behind his back, applied the other handcuff on his right wrist. *Id.* at pp. 12 and 16.

Once handcuffed, Cohen was lifted to his feet and removed from the cell by Crites and Gordon. *Id.* at pp. 12 14,16 , and 18. Cohen was escorted "bent over, facing forward, in a controlled escort position" to the property strip cage. *Id.* at p. 12. Once at the property strip cage, Crites and Gordon report that a strip search was performed without incident and Cohen was secured inside the strip cage to await medical attention. *Id.* at pp. 12, 14, 16, and 18. Gordon called for medical staff. *Id.* at p. 12.

Pictures were taken of Cohen's injuries. *Id.* at pp. 29 – 30. His injuries were described by James Hunt, R.N. as including a "raised area over lateral right eye 3 cm across and 1 cm raised." *Id.* at p. 26. Additionally, Hunt noted there was a small amount of blood present at the eye, but no open areas were noted and the eye itself appeared normal. *Id.* Cohen also had a small amount of dry blood inside his nose with bruising. *Id.* Hunt notes Cohen would not allow him to clean the blood out of his nose, but that he could breathe through it. *Id.* Cohen also suffered two small abrasions to his right knee and three to his left knee which appeared superficial and were cleaned with saline. *Id.* Hunt states that Cohen would not answer any questions and gave no indication that he had suffered other injuries. *Id.*

Cohen denies covering his cell window, banging on anything inside of the cell, taking a fighting stance when the officers entered his cell, or assaulting the officers while they were there. In support of his version of the events, Cohen points out that the Notice of Infraction does not include charges for damage to property, refusing orders, or refusing to receive a new cellmate.

13

Rather, the Notice of Infraction only mentions the inability to perform a "wellness check" as cause for asking Cohen to uncover his window. Cohen maintains the wellness check was used as an excuse to gain entry to his cell in order to assault him. ECF 98-1 at p. 8. Cohen further points out that he is older (57 years old), suffers health issues, and is much smaller in size (5'7" and 160 lbs.) than any of the officers[6] involved in the use of force, making it unlikely that he would choose to attack the officers. *Id.* at p. 14. He claims he had just finished treatment for Hepatitis C which leaves him without the energy to do the things alleged by Correctional Defendants. ECF 98-1 at pp. 13 – 14. Finally, Cohen states that he lost all of his teeth in 2006 and at the time of this incident he was not wearing his dentures, making Crites' claim that Cohen bit his leg unlikely. *Id.* at p. 15. Cohen further avers that he did not have dentures until March 19, 2014, but even if he had them there would have been something mentioned about the dentures coming out during the assault. *Id.* Cohen's version of events that took place in the second cell where he was strip searched differs wildly from Correctional Defendants' assertion that essentially nothing out of the ordinary took place. Cohen maintains he was again choked to unconsciousness and that he was in such a weakened state he was unable to comply with the orders given by Gordon.

Correctional Defendants submit as an exhibit the video from the surveillance camera on the housing unit where Cohen was housed, which depicts the following significant events at the noted times:

> 4:00:24 – Beginning of recording. Crites is standing at the cell door accompanied by another officer who is escorting an inmate wearing an orange jumpsuit.
>
> 4:01:41 – The escort officer leaves the area with the inmate.
>
> 4:01:51 – Another officer arrives in the area in front of Cohen's cell.

---

[6] Cohen states all of the officers are at least six feet tall and weigh 200 pounds or more. ECF 98-1 at p. 14.

4:02:13 – Two additional officers arrive.

4:02:35 – Cohen's cell door opens and officers enter; one officer in the back of the group appears to enter hurriedly and aggressively.

4:04:01 – Cohen is seen escorted from the cell by two officers, one at each side. Cohen's arms are restrained behind him and his head is being held down.  Cohen is walking.

4:04:13 – Cohen is off camera.

4:04:38 – Two officers leave Cohen's cell.

ECF 85-9.

The surveillance video does not include sound.  Thus, it cannot be discerned what if anything was said by the officers prior to entering the cell, nor can the claim that Cohen was banging on something inside the cell be verified.  Correctional Defendants have not offered an explanation as to why the circumstances here were so exigent that a cell extraction team equipped with a video camera was not utilized or considered.  The noted disputes between the parties creates a genuine dispute of material fact regarding the need for force in this case which cannot be resolved on summary judgment as it requires a credibility determination.

Additionally, the extent of Cohen's injury is disputed.  Cohen maintains his skull was fractured and he was choked to unconsciousness twice.  The pictures of Cohen following the use of force, show an injury to his eye in the area where the fracture was noted.[7]  While the video surveillance refutes Cohen's assertion that he was dragged from the cell as he is clearly seen walking, restrained, and his head held down  in what Correctional Defendants refer to as a controlled escort (ECF 85-9), his allegation that he was twice choked unconscious is a matter requiring a credibility determination which may not be resolved on summary judgment.  Medical records submitted by Medical Defendants note alternative diagnoses for Cohen's reports of pain

---

[7]   While a later CT Scan notes that Cohen does not have a fracture, there is no evidence that the first x-ray report was incorrect and the fracture healed on its own.

symptoms following the use of force which include post-concussion syndrome, skull fracture, or hyperparathyroidism.  Clearly, two of the possible causes are related to trauma occurring to Cohen's face and head.

Cohen's Eighth Amendment claim of excessive use of force against Defendants Crites, Eagleson, and Durst survives summary judgment.  Defendant Gordon was never served with the Complaint; further efforts to serve Gordon shall take place after counsel is appointed to represent Cohen.  Correctional Defendant Mortimore  has provided a declaration under oath that he was not involved in the use of force or any other aspect of Cohen's removal from his cell and subsequent placement in the observation cell.  ECF 85-14.  Cohen has failed to dispute Mortimore's claim, other than continuing to insist that five officers were present and that Mortimore was one of the officers involved.  The video evidence clearly refutes Cohen's assertions regarding Mortimore; therefore, the claim as to Mortimore shall be dismissed.

<u>Medical Claim</u>

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).  In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but

16

failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), quoting *Farmer*, 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000); citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

Cohen's claim regarding medical care asserts that Medical Defendants have refused or denied medical care for the injuries he suffered during the use of force incident and that Correctional Defendants Rounds and Bishop, as well as other unknown officers, have interfered

with prescribed care or have prevented him from attending medical visits.   Review of Cohen's medical records reveal the following course of care.

Cohen was seen on March 7, 2014, by James Hunt following extraction from his cell and a raised area over his right eye was noted.   ECF 82 at Ex. A, pp. 2 and 104.   Hunt noted that "ice will be applied to the eye and all other areas were cleaned and should require no further attention." *Id.* at p. 2.   Cohen was again seen by Kristi Cortez on March 12, 2014, for complaints of headache, blurred vision, and vertigo.   *Id.* at pp. 3 – 4.   Cortez observed "periorbital edema," noted Cohen was complaining of pain to his head and neck, and requested x-rays of his facial bones and cervical spine, but Cohen was not brought out of the contingency cell to receive the x-rays because he did not have any clothing.[8] *Id.* at pp. 6 – 8.

On March 22, 2014, Cohen was examined by Krista Swan, RN for continuing complaints of headaches and dizziness, and provided a neurological examination which was normal.   *Id.* at p. 8.   Swan noted Cohen's right cheek was swollen and "tender with palpation." *Id.*   As a result of her exam, Swan wrote a referral for Cohen to be evaluated and treated by a "provider." *Id.* at p. 9.   Three days later Cohen was examined by Dr. Colin Ottey and he reported that he had been experiencing vertigo for two weeks, but that the vertigo was improving.   *Id.* at p. 13.   Dr. Ottey noted Cohen had no chest pain, vomiting or motor weakness.   *Id.*   Cohen reported blurred vision, but examination of pupillary reaction was normal.   *Id.*

Medical Defendants state that Cohen suffers hyperparathyroidism, an excess of a parathyroid hormone in the bloodstream which can create symptoms of bone pain, stomach pain, and headaches.   ECF 82 at Ex. B.   Cohen was diagnosed with the condition in early 2013, prior to the alleged use of force on March 7, 2014.   ECF 15-2 (Affidavit of Dr. Ava Joubert).   A

---

[8]   Cohen was noted to have "refused" the x-ray by security staff.   Medical records indicate the x-ray was requested for the following day and that Cortez contacted Dr. Joubert regarding the need for same.   ECF 37-1 at p. 50.

consultation at the University of Maryland Medical Center for evaluation of Cohen's

hyperparathyroidism on August 21, 2013, resulted in a determination that he should be treated

with Vitamin D therapy and that he did not qualify for surgery at that time. *Id.* Medical

Defendants maintain that the symptoms Cohen attributes to the March 7, 2014 use of force,

(vertigo, bone pain, and blurred vision) are also symptoms of hyperparathyroidism and/or mild

concussion injury. *Id.*

Cohen was again examined by Hunt on April 1, 2014, for complaints of continued

headaches, vertigo, and blurred vision. ECF 82 at Ex. A, p. 16.   At that time Cohen had been

receiving Antivert, a medication used to treat vertigo,[9] but the medication was stopped that day.

*Id.*   The following day Cohen was seen in the chronic care clinic for Hepatitis C, where it was

noted that he was not experiencing dizziness, vision changes or headaches. *Id.* at p. 17.

On April 28, 2014, Cohen was examined by Kristi Cortez, for continued headaches,

blurred vision, and discomfort in his right hand and arm. *Id.* at pp. 24 - 25.   Cohen was

informed that an optometry consult was pending and had been placed on March 25, 2014. *Id.* at

p. 24.  He was advised to return to using sick call if his symptoms did not improve. *Id.* at p. 26.

On May 7, 2014, Cohen was again examined by Cortez for continued complaints of

discomfort in his right arm and face. ECF 82 at Ex. A, p. 30.  Cohen described his pain as

numbness and tingling and reported decreased mobility as well as blurred vision. *Id.* At that

time Cohen also denied ever refusing medical appointments. *Id.*   On May 8, 2014, x-rays of

Cohen's facial bones and cervical spine were ordered by Janette Clark, NP. *Id.* at p. 33.  The x-

rays were performed on May 15, 2014, and revealed a mild fracture or suture separation without

displacement at the right front zygomatic suture (where the zygomatic bone and the zygomatic

---

[9] *See* www.drugs.com.

process meet), without significant displacement. *Id.*, *see also* ECF 12 at p. 9). All remaining bones were intact. ECF 82 at Ex. A, p. 33.

The two month delay in receiving the x-ray cannot be attributed to Cohen, nor does it appear to be attributable to medical staff. Rather, there is a genuine dispute of material fact regarding Correctional Defendants' interference with needed diagnostic care in this instance. The denial of a medically ordered x-ray based on the fact that Cohen did not have access to clothing at the time does not appear justifiable by any legitimate security reason. Clearly Cohen could have been provided clothes for the purpose of receiving an x-ray.

On May 24, 2014, Clark discussed the x-ray results with Cohen. ECF 82 at Ex. A, p. 39. At that time, Cohen reported his ears hurt; on examination Clark noted that both ears had excessive cerumen with the right worse than the left. *Id.* Treatment for the excessive ear wax was provided. *Id.*

On June 7, 2014, Cohen was examined by Cortez, but the examination was terminated after his blood pressure taken because Cohen raised his voice in an aggressive manner. ECF 82 at Ex. A, p. 42. On June 10, 2014, Cohen was described by William Beeman as agitated and argumentative and reported that Cohen claimed "we are not doing anything for him." *Id.* at p. 44. Beeman saw Cohen for his complaints of headache, eye pain, and right arm pain. *Id.* at p. 47. At that exam, Beeman noted Cohen was a poor historian, aggressive, and argumentative. *Id.* Cohen told Beeman that the elbow pads he had been provided did not help with his pain, and Beeman agreed to provide him with an elbow sleeve. *Id.*

Two days later it was revealed that Cohen had gone on a hunger strike as of June 9, 2014, to call attention to the lack of care he was receiving for the injuries he incurred as a result of the March 7, 2014 incident. ECF 82 at Ex. A, p. 50. Cohen was seen by Hunt, who noted that Cohen

initially refused to be seen, but changed his mind after he received an elbow brace.[10] *Id.* Hunt described Cohen as being vague throughout this examination and that he changed his story several times during the examination. *Id.* The following day, a mental health assessment of Cohen was performed due to his hunger strike. *Id.* at pp. 51-52. Cohen explained he went on the hunger strike because it took two months to get x-rays which revealed that he had a skull fracture. *Id.* at p. 51. He further claimed he had only been given Ibuprofen which made him vomit. *Id.* Cohen further related that he had experienced blurred vision, headaches, and vertigo since March 7, 2014, and that he just wanted to know what was wrong with him. *Id.* at p. 51. Cohen was described as reasonable and rational during the interview. *Id.* at p. 52.

Dr. Ava Joubert examined Cohen on June 13, 2014, and noted his history of headaches and body aches which she attributed to hyperparathyroidism given his history of elevated calcium levels. ECF 82 at Ex. A, pp. 54 and 56. Dr. Joubert further noted Cohen's history of a right zygomatic arch fracture which occurred on March 7, 2014, with worsening headaches, and visual disturbances. *Id.* As a result of her examination, Dr. Joubert ordered a CT scan of Cohen's head and neck, but also noted a presumed diagnosis of hyperparathyroidism and hyper-calcium. *Id.* at p. 54. Blood tests revealed Cohen had an elevated calcium level of 12.2, prompting Dr. Joubert to recommend his admission to the infirmary with IV hydration with further monitoring of both his calcium and magnesium levels. *Id.* at pp. 56-57. While in the infirmary, Cohen was provided with IV fluids, Lasik 40 mg for his elevated calcium level, and Excedrin migraine for his headache. *Id.* at p. 58. On June 14, 2014, Autumn Durst, RN noted that Cohen's calcium level had dropped to 11.6. *Id.* at p. 65.

---

[10] Cohen suffers right elbow bursitis (ECF 82 at Ex. A, p. 44) and was provided an elbow pad which he claimed did not work. *Id.* at p. 49. Cohen was provided an elbow sleeve in lieu of the pad. *Id.* at p. 50.

Dr. Ottey also examined Cohen on June 14, 2014.  Cohen reported that it was his seventh day without eating and that he continued to have a headache, but was not dizzy or nauseated. ECF 82 at Ex. A, p. 66.  Cohen reported that the medication he was receiving for his headache was not working.  *Id.*  Dr. Ottey encouraged Cohen to eat and prescribed Tegretol and Tylenol III for his headache.  *Id.*  Cohen stated he had not eaten for one week.  *Id.*   On June 15, 2014, when Cohen was again seen by Dr. Ottey, he reported that he was receiving some relief from the new medications and that he was considering ending his hunger strike.  *Id.* at p. 73.  Dr. Ottey again encouraged him to eat. *Id.*  Cohen ended his hunger strike on the following day when he ate all of his evening meal. *Id.* at p. 81.

On June 16, 2014, Dr. Barrera examined Cohen, who was still in the infirmary and noted that he had mild hypercalcemia, with persistent elevations in his calcium levels. ECF 82 at Ex. A, p. 79.  Dr. Barrera noted that he believed Cohen's chronic headache was post-traumatic and recommended a brain CT scan if the headache persisted.  *Id.*  Cohen was discharged from the infirmary on June 17, 2014,  and returned to segregation housing.  *Id.* at p. 88. Nursing notes made throughout Cohen's infirmary admission describe him as alert and orientated and do not note any behavioral issues.  *Id.* at pp. 62 – 64; 68 – 72; 75- 78; and 81 – 87.  Dr. Renato Espina examined Cohen prior to his discharge, noting that Cohen's only concern was his right-side headache.  *Id.*  at p. 88.  Dr. Espina also noted that "zygoma is not tender to touch." *Id.*

On June 23, 2014, Plaintiff was examined by Kimberly Martin, RN, in response to his complaint that he was not receiving the same medications he had received in the infirmary.  ECF 82 at Ex. A, p. 91.  Martin verified that Cohen had not been receiving Tylenol III since his discharge from the infirmary, and added it to Cohen's medications. *Id.*

On June 25, 2014, Dr. Joubert requested a parathyroidectomy[11] for treatment of Cohen's hyperparathyroidism. ECF 82 at Ex. A, p. 95.  She noted Cohen had multiple pain issues, including headaches, and that Cohen had been on vitamin D therapy, which he did not feel led to any improvement.  *Id.*  Dr. Joubert saw Cohen on June 25, 2014 and he continued to complain of headaches.  *Id.* at p. 98.  Dr. Joubert reassured Cohen that a referral to the general surgeon was forthcoming.  *Id.*

A CT Scan of Cohen's head and spine  was performed on July 14, 2014, which revealed changes in cervical spondylosis, but no fractures.  ECF 82 at Ex. A, p. 308.  The exam was negative with no signs of inter-cranial hemorrhage, but a possibility of "pleural effusions" could not be excluded.  A follow-up CT Scan of the chest was thus recommended.  *Id.*

On July 15, 2014, Cohen was examined by Clark for continued complaints of headache and dull pressure.  *Id.* at p. 130.  Clark noted the headaches occurred during the daytime and were made worse by bright lights, caffeine, noise, and stress.  *Id.*  At that time, Cohen did not complain of dizziness, visual disturbances, memory loss, nausea, or personality change.  *Id.*  She continued Cohen on Excedrin migraine, but did not provide narcotic pain relievers because the CT Scan did not show an acute fracture.  *Id.*

On July 21, 2014, Dr. Joubert met with Cohen and reviewed the results of the CT Scan. ECF 82 at Ex. A, p. 125. It was explained to Cohen that the CT scan of his head did not support a finding that he had a fracture or separation in his facial bones. ECF 82 at Ex. B.  The views of Cohen's spine, however, showed possible bilateral effusions of his spine.  ECF 82 at Ex. A, p. 125.

On July 29, 2014, Cohen's medical trip to provide him with surgery for hyperparathyroidism was cancelled due to his alleged refusal to go.  ECF 82 at Ex. A, p. 132.

---

[11]  Dr. Joubert noted that treatment for hyperparathyroidism is surgery.  *Id.*

Cohen signed a Release of Responsibility, which stated that he was refusing the medical trip, against the advice of medical personnel. *Id.* at p. 309.   Cohen claims he did not refuse the trip and also disputes that the trip was for purposes of receiving surgery because it had already been determined he was not a candidate.  ECF 97 at p. 9.

On August 6, 2014, Cohen reported he began another hunger strike on August 3, 2014, explaining that he wanted his head and face examined by a doctor and complaining he had been denied surgery for his hyperparathyroidism.  ECF 82 at Ex. A, p. 135.  Dr. Joubert attempted to explain to Cohen that the medical trip he had refused was for the purpose of seeing the general surgeon about his parathyroid and Cohen replied, "you all can talk to my lawyer." *Id.*  Cohen left the exam room and refused to sign a form stating the effects of starvation and giving consent for treatment.  *Id.*

On August 7, 2014, Cohen informed Dr. Joubert he wanted to see the surgeon since learning that hyperparathyroidism can cause the pain he was experiencing, but Dr. Joubert informed Cohen he could not receive additional treatment until he ended his hunger strike.  *Id.* at p. 137.   Despite being so advised, Cohen informed Dr. Joubert that he intended to continue his hunger strike.  *Id.*  Cohen was further advised of the potential for damage to his organs and for death as a result of his hunger strike.  *Id.*  Dr. Joubert noted he acknowledged the potential for harm and appeared to understand; she further noted he was drinking fluids.  *Id.*

On August 8, 2014, Cohen informed Dr. Ottey he was continuing his hunger strike because he was concerned about his appointment for an outside specialty evaluation and again stated he had not refused the trip. ECF 82 at Ex. A, p. 139.  Cohen continued his hunger strike despite being encouraged to eat by medical staff, but agreed to accept IV fluids on August 10, 2014.  *Id.* at pp. 141 and 145.  Cohen reported episodes of lightheadedness at that time.  *Id.* at p.

24

141. Krista Swan, RN, administered IV fluids pursuant to Dr. Ottey's orders on August 10, 2014. *Id.* at p. 143. The IV was started at 10:00 a.m. and a second liter was begun at 11:20 a.m. *Id.* At noon, Swan reported that Cohen began spitting on the floor and, despite being told not to do so and being provided with a trash can, he continued to spit on the floor. *Id.* Cohen's IV was stopped and Dr. Ottey was informed. *Id.*

On August 11, 2014, Dr. Joubert examined Cohen, who was on the sixth day of his hunger strike, and advised Cohen there were no problems with his zygomatic arch based on the CT Scan. ECF 82 at Ex. A, p. 149. Cohen continued to complain of persistent head and right-sided face pain. *Id.* On August 12, 2014, Cohen told Dr. Ottey he was experiencing abdominal pain and that he was going to eat dinner. *Id.* at p. 152. The following day, Cohen told Dr. Joubert he ate the prior evening, but vomited. *Id.* at p. 154. He expressed his intent to continue to eat small meals. *Id.*

On August 14, 2014, a CT Scan of Cohen's chest, abdomen, and pelvis was performed and revealed a 3mm pulmonary nodule in the right lower lobe of his lung with scattered bilateral heterogeneous densities; debris and fluid in the stomach, mild fatty liver infiltrate and cholelithiasis in a contracted gallbladder. ECF 82 at Ex. A, p. 156. On August 20, 2014, Cohen was seen by Robert Claycomb, RN for headache. *Id.* at p. 162. Cohen reportedly told Claycomb that Claycomb could not help him and that he needed to see a doctor to discuss his CT results. *Id.* The results of the CT Scan were discussed with Cohen on August 22, 2014. *Id.* at p. 168. Janette Clark, NP told Cohen what the scan showed and noted a plan to consult a pulmonary specialist to consider peritoneal neoplastic syndrome. *Id.*

On August 28, 2014, Plaintiff was examined by Claycomb for complaints of headaches, blurry vision in his right eye, and tingling in his right arm. ECF 82 at Ex. A, p. 171. Cohen

complained he had not received the extra juice that had been ordered by Ms. Clark.  *Id.*  He related he was still having headaches with blurry vision in his right eye and tingling in his right arm.  *Id.*  He was described as pleasant and cooperative with care.  Claycomb noted that custody and dietary staff maintained the extra juice order was expired and that Cohen had water to drink in his cell.  *Id.*

On September 2, 2014, Cohen was seen by James Hunt for complaints of pain in his right eye, right shoulder, and fingers.  ECF 82 at Ex. A, p.175.  Hunt noted that Cohen refused to allow him to touch his eye, shoulder, or fingers during the examination. *Id.*  Hunt related that Cohen spoke "very low," making it difficult to understand what he was saying; kept a distance away; and would not make good eye contact.  *Id.*  Notwithstanding Hunt's observations, he noted Cohen as being in no acute distress.  *Id.*

Cohen was admitted to the infirmary on September 10, 2014, with symptoms of an electrolyte imbalance.  *Id.* at p. 179.  At that time Cohen was complaining of cramping in his hand when writing.  *Id.* It was noted that there was concern that Cohen had peritoneum malignancy, but Cohen remained focused on the pain in his hand and head.  ECF 82 at Ex. A, p. 179.  The admission note states that Cohen's hyperparathyroidism symptoms may be due to neoplasm.  *Id.*  While Cohen was in the infirmary, nursing notes prepared by Burnice Steuben on September 10, 2014, describes Cohen as argumentative with security staff.  *Id.* at p. 183.  After Cohen was asked to allow Steuben to check his vital signs, Cohen apologized and told her he was embarrassed by his behavior.  *Id.*  Steuben noted Cohen was cooperative with care thereafter.  *Id.*   He remained in the infirmary on September 11, 2014, where he was monitored for dehydration and an electrolyte imbalance.  *Id.* at p. 184.   Cohen related he felt much better after receiving IV fluids.  *Id.*

On September 12, 2014, it was noted Cohen was admitted to the infirmary with a hypercalcemia, with a calcium level of 14.7. *Id.* at p. 191. At that time, Cohen's only complaint was a headache. *Id.* Dr. Barrera noted that he was going to start Cohen on Fosamax (a drug used to treat osteoporosis) and prednisone, noting the possibility that Cohen's abnormal lab work may be bone related. *Id.* Cohen declined to take Naprosyn and Excedrin migraine because they were not providing him relief from his headache. *Id.* at pp. 193, 206, and 215. Nursing notes describe Cohen as calm and cooperative. *Id.* at pp. 193 – 99.

On September 13, 2014, Cohen reported to Dr. Ottey that he was experiencing pain in his facial bone, pain in his right hand, and episodes of confusion. *Id.* at p. 201. Another x-ray of Cohen's facial bones was taken and revealed no evidence of an acute fracture, dislocation, or subluxation. *Id.* at p. 200. Cohen's right hand was also x-rayed and revealed no evidence of an acute fracture, dislocation, or subluxation. *Id.* On September 14, 2014, Cohen reported to Dr. Ottey that he still had a headache and pain in his fingers, but was feeling better. *Id.* at p. 209. Cohen denied any dizziness or blurred vision.

On September 15, 2014, Cohen's hypercalcemia level had been reduced from 14 to 11, and Dr. Joubert noted he was currently waiting for a consultation with a pulmonary specialist. *Id.* at p. 218. Dr. Joubert also noted that Cohen's vitamin D levels remained low despite replacement. *Id.* Cohen was discharged from the infirmary the following day. *Id.* at p. 226.

On September 25, 2014, Cohen was provided with a periodic physical exam. *Id.* at pp. 232 – 40. At that time he denied having a headache and reported the cramping in his left hand was improving. *Id.* at p. 232. Cohen was instructed to increase his water intake. *Id., see also* p. 263.

Cohen was examined by Krista Swan, RN on October 5, 2014, for complaints of vertigo. ECF 82 at Ex. A, p. 253. Cohen expressed concern due to the similarity in symptoms when he had hypercalcemia. *Id.*

Plaintiff was examined by Dr. Surjit Julka at Bon Secours Hospital on October 8, 2014, at which time Dr. Julka found that Plaintiff had a 3mm nodule in the right lower lobe of his lung and suffers from hyperparathyroidism. *Id.* at p. 316.

On October 14, 2014, Cohen was examined by Claycomb related to ongoing complaints of headaches, pressure over eyes, and pain in his right hand, but did not cooperate with the examination. *Id.* at p. 261. Claycomb noted he asked Cohen why he was there and Cohen responded "come on man" and left the exam room with security. *Id.*

On October 15, 2014, Plaintiff met with Ms. Clark to review his pulmonary consultation, which showed that he had a 3mm nodule in his right lung and hyperparathyroidism. *Id.* at p. 263. The treatment plan at that time was to follow up with another CT Scan of Cohen's chest in six to twelve months. *Id.* Clark noted that she was going to inquire about rescheduling a consultation for evaluation of his hyperparathyroidism, because he previously declined treatment on July 29, 2014. *Id.* Clark noted Cohen still experienced daily headaches, but his request for Tylenol III was not indicated. *Id.*

On November 3, 2014, Cohen met with Joubert, Beeman, Clark, and. Swan regarding the medical care he has been receiving. Cohen expressed his concern about his persistent headaches, the possibility that he has lung cancer, and the issues regarding his parathyroid. ECF 82 at Ex. A, p. 272. Cohen was advised that his symptoms are likely the result of post-concussion syndrome. *Id.* A CT scan of Cohen's zygomatic process and paranasal sinuses was ordered as a result of the meeting. *Id.* Additionally, a plan to send a copy of the CT scan of Cohen's lungs to a pulmonary specialist was discussed as well as a plan to increase his Vitamin D levels with a follow-up ultrasound of his parathyroid. *Id.* On November 6, 2014, Cohen was told he was going to receive Amitriptyline for treatment of his post-concussion syndrome. *Id.* at p. 276.

On November 20, 2014,  Cohen was seen by Dr. Douglas Turner, a specialist in endocrine surgery, but Cohen's PTH levels were not available for Dr. Turner's review. ECF 82 at Ex. A, pp. 310 - 11.  Dr. Turner recommended additional tests to confirm whether Cohen has hyperparathyroidism and to return for surgery if symptoms persist. *Id.* at pp. 310 – 11 and  294.

On December 1, 2014, Cohen was seen by Swan, who noted that Cohen was receiving vitamin D to treat his hyperparathyroidism, and that his headaches had improved after starting to take Elavil. ECF 82 at Ex. A, p. 287.   Ottey examined Cohen on December 4, 2014, and reported that  radiology reports were reviewed with the ENT and surgery was not required. *Id.* at p. 291. On January 6, 2015, when Cohen met with Swan regarding his medication he reported that his headaches had improved and had only one episode of blurred vision and lightheadedness. *Id.* at p. 300.  Additional tests to monitor  PTH and calcium levels, as recommended by Dr. Turner have been ordered and Cohen's condition is currently managed through use of medications that manage vitamin D and calcium blood levels.  ECF 82 at Ex. B.

The dispute between Cohen and Medical Defendants centers on what is causing his symptoms.  Cohen maintains his symptoms are caused by the assault and appears to rebuff efforts to treat his hyperparathyroidism as dismissive of the injuries he sustained during the use of force.  Cohen has received medical care for the pain he reported to medical staff along with close monitoring of all of his medical conditions.  The fracture to the bone in his face did not require surgical intervention; pain management, which he received, is the treatment for such an injury.

Cohen's disagreement with medical staff's approach to determining which of his conditions are causing his pain is simply not a basis for an Eighth Amendment claim.  It is clear from the objective evidence that Medical Defendants did not exhibit a callous disregard for the

pain he reported.  Medical Defendants are entitled to summary judgment in their favor on

Cohen's Eighth Amendment claim against them.

Conditions of Confinement

Conditions which "deprive inmates of the minimal civilized measure of life's necessities"

may amount to cruel and unusual punishment.  *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981).

However, conditions which are merely restrictive or even harsh, "are part of the penalty that

criminal offenders pay for their offenses against society."  *Id.*

> In order to establish the imposition of cruel and unusual
> punishment, a prisoner must prove two elements - that "the
> deprivation of [a] basic human need was *objectively* sufficiently
> serious," and that "*subjectively* the officials acted with a
> sufficiently culpable state of mind."

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; citation omitted).

"These requirements spring from the text of the amendment itself; absent intentionality, a

condition imposed on an inmate cannot properly be called "punishment," and absent severity,

such punishment cannot be called "cruel and unusual." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir.

2008) citing *Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991).

To establish a sufficiently culpable state of mind, there must be evidence that a known

excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson*, 501 U. S. at

298.  In other words, "the test is whether the guards know the plaintiff inmate faces a serious

danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. North*

*Carolina Dept. of Corrections,* 612 F.3d 720, 723 (4th Cir. 2010), quoting *Case v. Ahitow*, 301

F.3d 605, 607 (7th Cir.2002).  Conduct is not actionable under the Eighth Amendment unless it

transgresses bright lines of clearly-established pre-existing law. *See Maciariello v. Sumner*, 973

F. 2d 295, 298 (4th Cir. 1992).

The objective prong of a conditions claim requires proof of an injury. "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir.1993). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir.2003). Demonstration of an extreme deprivation proscribed by the Eighth Amendment requires proof of a serious or significant physical or emotional injury resulting from the challenged conditions. *See Odom v. South Carolina Dept. of Corrections*, 349 F. 3d 765, 770 (4th Cir. 2003).

Defendants' actions are not actionable unless, "in light of preexisting law the unlawfulness of those actions is apparent." *Iko v. Shreve*, 535 F. 3d 225, 238 (4th Cir. 2008) citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "We do not require of such officials the legal knowledge culled by the collective hindsight of skilled lawyers and learned judges, but instead only the legal knowledge of an objectively reasonable official in similar circumstances at the time of the challenged conduct." *Johnson v. Caudill*, 475 F. 3d 645, 650 (4th Cir. 2007).

Cohen's claim regarding conditions of confinement relate to his placement in a strip cell on staff alert following the March 7, 2014 incident where he was denied clothes, mattress, sheets, blanket, soap, or toilet paper and where he remained until March 18, 2014. ECF 98 at p. 7. Cohen further avers that he was denied lunch meals while he was confined to the strip cell because he was unable to get on his hands and knees at the back of his cell as ordered by Officer Rounds, Jr. *Id.* It is undisputed that during this time Cohen was denied access to a medically ordered appointment for an x-ray due to the fact he was not provided clothes. Cohen also claims security staff regularly reported he refused medical appointments when in fact he did not. When

he reported this issue to medical staff, steps were taken to insure that a member of medical staff could verify his refusal.

While it is true that Correctional Defendants are not qualified to determine whether an inmate requires medical attention and their interference with prescribed care is a possible Eighth Amendment claim, in the instant case Cohen received adequate medical care and the missed appointments did not result in a significant injury.   Nor did the conditions of his confinement from March 7 through March 18, 2014, result in a significant injury.

Defendant Major Thomas Mellott states in his declaration under oath that his only involvement in the incidents described in the Complaint were reviewing the Use of Force reports and approving Cohen's placement on staff alert status.  ECF 85-16.  Cohen's claim against Defendants  Bishop, Mellott and McAlpine are based on the doctrine of *respondeat superior*, meaning Cohen attributes liability to them based solely on their positions as supervisors.  The law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983).

Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001) citing *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984).  Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the

knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).   There is nothing in the allegations to support a finding of supervisory liability on the part of Defendants Bishop, McAlpine, or Mellott, entitling them to summary judgment in their favor.

     A separate Order follows.


                                    _____/s/_____

                                    William M. Nickerson
                                    Senior United States District Judge

DATED: August 27, 2015